443 A.2d 358

Jack YOFFE and Donald Yoffe,

v.

KELLER INDUSTRIES, INC., Appellant.

Superior Court of Pennsylvania.

Argued Dec. 5, 1980.

Filed March 19, 1982.

Marvin Comisky, Philadelphia, for appellant.

Philip M. Hammett, Philadelphia, for appellees.

Before HESTER, CAVANAUGH and VAN der VOORT, JJ.

VAN der VOORT, Judge:

The Yoffes owned four Pennsylvania Corporations. They authorized an attorney to find a buyer for the corporations; their asking sale price was $1,500,000. Eventually, appellant executed an agreement of sale with the Yoffes for the sale and purchase of the businesses.

Pursuant to such agreement the Yoffes received 51,064 shares of Keller stock with a value on August 24, 1967 of $29⅜ per share for a total of $1,500,005 (51,064 × $29⅜).[1] As Keller shares were not covered by any registration statement approved by the Securities and Exchange Commission, (hereafter referred to as the SEC), such shares had to be registered with the SEC before the Yoffes could sell them on the NYSE. The sales agreement provided that Keller "would undertake the registration". (Exhibit P–1 § 3a). The agreement further provided that Keller would immediately undertake to register at least one-half of the shares; the balance to be registered within two years. The agreement also contained a "Guaranty of Base Price". (Exhibit P–1, § 5). This provision was that if the closing price of Keller stock, on the day they became tradeable, was less than $29⅜ per share, Keller would issue additional shares to make up the difference between the NYSE price and $29⅜ per share. If the stock closed $29⅜ or higher then the Yoffes would be entitled to no additional shares; nor would Keller be entitled to any rebate.

1. All references to the value of such stock refer to the New York Stock Exchange's (hereafter referred to as NYSE) closing price.

A registration statement covering 10,100 shares became effective August 11, 1968; the NYSE value per share on that date was greater than the guaranteed price. The remaining 40,964 shares "were the subject of a subsequent modification". The parties by agreement, dated December 17, 1968, redefined Keller's responsibilities regarding the registration of the remaining shares. Keller's obligation was reduced from, "undertaking the registration" to, the filing of a registration statement and to "exercise reasonable efforts" to have the statement become effective as soon as possible. The parties subsequently further amended their agreement to extend the time for filing the registration statement as to the remaining shares to June 1, 1970.

On June 1, 1970, Keller filed a registration statement with the SEC covering the remaining shares. The SEC took no action on the statement. On June 23, 1971, Keller filed an amendment to the registration statement, supplying current information as required by the SEC rules. The SEC issued a letter of comment on August 27, 1971, in which it suggested certain technical changes as a condition for approval. Keller filed a second amendment and the registration statement became effective November 30, 1971. The NYSE value of that date (after adjusting for a two for one stock split) was $37½ per share; that value exceeded the guaranteed value of $29⅜ per share.

Jack Yoffe filed an action for breach of contract on July 17, 1972.[2] On October 31, 1974, Donald Yoffe was permitted to join as an additional plaintiff and to file a separate amended complaint in assumpsit. The basis for the Yoffes' claim is that the second registration statement should have become effective six weeks after its filing, i.e., July 11, 1970. Appellees claimed that appellant had not proceeded with reasonable efforts to have the statement become effective. Instead it is claimed that Keller had filed a false and misleading registration statement resulting in the greater than eighteen (18) month delay. The closing value on July

2. The action was originally filed in equity but was transferred on August 22, 1973 to the law side of the court.

11, 1970 was $10⅛ per share. The Yoffes averred that had Keller exerted reasonable effort the statement would have been effective as of that date and under the guaranteed price provision Keller would have been obligated to issue an additional 77,882 shares to Yoffes.[3]

The trial commenced before the court sitting with a jury. Just prior to charging the jury the trial court, over appellant's objection, indicated it would submit to the jury a special verdict containing four questions. The jury found that Keller had not exercised reasonable efforts and that the statement should have become effective on July 17, 1970. The jury was polled and discharged. The court subsequently molded a verdict for appellees. On the basis of the Act of April 10, 1929, P.L. 476, 68 P.S. § 481,[4] then in effect, the trial court computed Yoffes' damages to be $1,173,875.

Appellant's motions for judgment n.o.v. and for a new trial were denied by the court sitting en banc on December 10, 1979. On January 7, 1980, Keller appealed to this Court at No. 82 Philadelphia 1980, from the denial of his post trial motions. Judgment was entered in favor of the Yoffes and appellant filed a second appeal at No. 499 Philadelphia 1980. The appeal from the order denying post trial motions must be quashed as being interlocutory as no judgment had been

3. At $10⅛, the remaining 40,964 shares had a value of $414,760.50 (40,964 × $10⅛). Where as the same shares at the Guaranteed Price had a value of $1,203,317.50 (40,964 × $29⅜). The difference between the two values is $788,557.00 ($1,203,317.50 minus 414,760.-50). To make up this difference an additional 77,882 shares at $10⅛ would have to be transferred ($788,557.00 divided by $10⅛).

4. § 481. Conversion of property of fluctuating value: damages
In any proceeding hereafter instituted in any court of this Commonwealth, in which damages are claimed for the conversion of stocks, bonds, or other like property of fluctuating value, the damages shall be limited to the difference between the proceeds of the conversion, or that portion thereof duly paid or credited to the owner, and such higher value as the property may have reached within a reasonable time after he had notice of the conversion. Where the facts are not in dispute, this period shall be fixed by the court as a matter of law. 1929, April 10, P.L. 476, No. 194, § 1. Repealed 1978, April 28, P.L. 202, No. 53 § 2(a) [1099] effective June 27, 1978. Substantially reenacted at 42 Pa.C.S. § 8335.

entered. *Brogley v. Chambersburg Engineering Company*, 283 Pa.Superior Ct. 562, 424 A.2d 952 (1981).

▆ Keller raises three issues in its appeal at No. 499. The first claim is that the Yoffes failed to prove all of the elements of a breach of contract by Keller. Due to our disposition of this issue we need not address the other two issues. Appellant argues that the delay was a result not of its wrongdoings or inactivity but instead resulted from the unorthodox procedure utilized by the SEC. The Yoffes counter, that the delay was the result of appellant's utilization of questionable accounting practices which caused the SEC to initiate an investigation of other Keller stock transactions and to cause it to withhold action on the current stock registration.

On its face, the registration statement was reasonably complete. These so-called "fraudulent acts and related conduct" alleged by appellee consisted of Keller's filing in 1969 with the SEC and circulating among its stockholders, quarterly financial statements for the 1st and 2nd quarters of its fiscal year 1969 which deferred certain allegedly seasonal charges to the later quarters. These "seasonal deferrals" were considered improper by the SEC and eventually resulted in the filing of a Complaint by the SEC in January 1971 against Keller, seeking an injunction against the complained of actions.[5] The alleged improper accounting methods also resulted in Giffen Industries bringing suit against Henry A. Keller, Keller's principal stockholder, to rescind an agreement to buy Henry A. Keller's stock.

A representative of the SEC testified in regards to the registration statement. The reviewing office after becoming aware of another branch's (of the SEC) investigation of Keller decided to take no action on the registration statement and to furnish no letter of comment. Nonetheless the

5. That litigation ended in a Consent Decree entered into on May 21, 1973, ordering Keller to desist from any device, scheme or artifice to defraud; or making untrue statements or omitting to state material facts; or engaging in any practice which would operate as a fraud or deceit.

SEC official testified that he and Keller's lawyers had discussed the investigation and registration but Keller took no action on the statement until it filed its first amendment. Keller filed its first amendment on June 23, 1971. The SEC issued a comment letter on August 27, 1971, principally requesting an update of financial statements, plus accounting information on the nature of "prior and present systems of deferrals", plus cross-reference where appropriate to transactions with Giffen Industries. (Exhibit P–7). A second amendment was filed on November 15, 1971, updating financial statements, supplying information on the accounting methods employed and noting the pending difficulties with the SEC and Giffen Industries. On November 30, 1971, the statement became effective. The SEC's inquiry was still pending. (See N.T. 473–531).

Throughout the intervening period between initial filing and the SEC's approval Keller's attorneys were frequently in contact with SEC, sometimes on a monthly basis, sometimes on a weekly basis; numerous meetings were held at the SEC offices. (N.T. pp. 741–763).

From our research, this case appears to be a case of first impression in this jurisdiction; though there are several cases from other jurisdictions which are somewhat related. In *Lipsky v. Comm. United Corp.*, 551 F.2d 887 (2nd Cir. 1976) an appeal was taken from an order striking portions of the complaint. The defendant therein had assumed a duty to use its best efforts to cause the registration statement to become effective. Plaintiff claimed that irregularities in the defendant's statements caused the SEC to file a complaint against the defendant which resulted in a consent judgment. The court there held that while the SEC's opinion may well be relevant to the question of whether the issuer used its best efforts, neither a complaint nor a reference to a complaint resulting in a consent judgment may properly be used to prove lack of best efforts.

In *United Telecomm. v. American Tel. & Comm. Corp.*, 536 F.2d 1310 (10th Cir. 1976) the issuer was to use its "best efforts" to obtain registration by preparing and filing the

registration statement and by causing the statement to become and remain effective. The issuer also represented and warranted that it would not engage in any action that would conflict or cause a breach of the agreement. Prior to the closing of the agreement, the issuer entered negotiations and reached an agreement as to a merger. The registration statement never became effective and was withdrawn by the issuer. The jury found for United. The Appellate Court found the merger to be in conflict with the registration making it unfeasible to proceed with registration thus resulting in the breach of the warranty.

Probably the most similar case is *Republic Technology Fund, Inc. v. Lionel Corp.*, 483 F.2d 540 (2nd Cir. 1973). There the circuit court found that even though Lionel had been cooperative and its law firm was diligent and competent it had not exerted reasonable efforts to maintain the effectiveness of the registration statement. The court noted that the 51 week delay was a result of the originally misleading interim statement which did not truly reflect a worsening situation. The court found that Lionel's management's giving of misleading statements to its public accountant, which resulted in the accountant's unwillingness to certify such statements may have been an omission to use "best efforts" to maintain effectiveness.

The final case we refer to is *Kupferman v. Consolidated Research & Mfg. Corp.*, CCH Fed.Sec.L.Rep. "61–64" Transfer Binder § 91, 197 (S.D.N.Y.1962). It involved an admitted failure to file a post-effective amendment. Consolidated's contention that the statement would have been subject to the discretion of the SEC was rejected as only defendant's own conduct either in failing to file an amendment or in filing one with inaccurate information or incomplete financial information would be factors which could have affected the SEC's discretion.[6]

---

**6.** Three other cases dealing generally with this topic, but which are sufficiently removed from the factual setting of this appeal are: *Marx & Co. v. Diners Club, Int.*, 550 F.2d 505 (2nd Cir. 1977) (improper expert testimony regarding "best efforts"); *Waste Management, Inc. v. Deffenbaugh*, 534 F.2d 126 (8th Cir. 1976) (issuer's

When reviewing the denial of motions for a new trial and for judgment notwithstanding the verdict the reviewing court must examine the evidence in a light most favorable to the verdict winner. Any conflicts in the testimony should be resolved in favor of the verdict winner. *Schneider v. Albert Einstein Medical Center, Northern Division,* 257 Pa.Superior Ct. 348, 390 A.2d 1271 (1978). In reviewing the transcripts of the lower court proceedings we find the following uncontested facts important.

First, the financial statement filed in conjunction with the registration statement was a consolidated statement encompassing the five and one-half (5½) years ending January 31, 1970. The SEC found no fault with this statement, nor did it question Keller's annual statements, but only questioned certain interim quarterly statements. (N.T. pp. 355, 530) While certain expenses of the first quarters were deferred, such would be accounted for in the second half of the year. (N.T. p. 682). Accordingly, Keller did not file a false and/or misleading registration statement. A representative of the SEC testified that when a registration statement is received, it would be reviewed and usually a letter of comment would issue. The SEC would then cooperate with registrant's counsel to correct any defects. Such statement would then become effective when the SEC considered the statement was complete, fair and adequate. (N.T. pp. 474–80). However, in the current case the arm of the SEC which was reviewing Keller's registration statement containing a consolidated statement learned that another section of the SEC had initiated an informal inquiry regarding Keller's quarterly statements and the registration process was halted. (N.T. p. 490).

The SEC admitted that seasonal deferrals were permissible at the time in question and that no uniform method of preparing such deferrals then existed. Instead there was a wide variety of practices at that time. (N.T. pp. 339–44).

financial apprehension does not excuse failure to use reasonable efforts); and *Madison Fund, Inc. v. Charter Co.,* 427 F.Supp. 597 (S.D.N.Y.1977) (buyer's refusal to compromise did not excuse insurer's obligations to use best efforts).

What concerned the SEC was that Keller's accounting journals did not adequately support the deferrals (N.T. p. 326). The public accounting firm employed by Keller agreed that different methods of seasonal deferrals existed at that time. It further stated that Keller had used the same method to match costs with revenues since 1960 and such practice met with the generally accepted practices. Such accountant, who had conducted a brief review [7] of the interim statements disagreed with the SEC and believed such deferrals were reasonable. (N.T. pp. 677–81). However, he did agree that the deferrals could not be precisely pinned-down in Keller's books. (N.T. p. 689).

Additionally, a new method regarding seasonal deferrals was adopted by Keller in April 1969, when the company came under new management. (N.T. pp. 714–15). Yet, the SEC continued with its complaint to enjoin the use of the previous method of handling such deferrals.

While the previously cited cases from the various federal courts especially the *Republic Technology* case, may offer us guidance, we must nonetheless resolve this case on the basis of Pennsylvania law. "We believe the present rule in Pennsylvania to be that acts of a third party making performance impossible or causing a delay . . . do not excuse failure to perform if such acts were foreseeable because it was the duty of the contracting party to provide for that situation in his contract." *Luria Eng. Co. v. Aetna Cas. & S. Co.*, 206 Pa.Superior Ct. 333, 337, 213 A.2d 151, 153 (1965) relying on *Moore v. Whitty*, 299 Pa. 58, 149 A. 93 (1930). The *Luria* court quoted approvingly from the lower court: "Having failed to provide against the very contingency which both parties were aware might occur, the happening of such contingency cannot be set up as an excuse for failure to perform." 206 Pa.Superior Ct. at 338, 213 A.2d 151. Similar results have followed in: *Wissahickon Realty Corporation v. Boyle*, 385 Pa. 198, 122 A.2d 720 (1956); *Bozzo Inc. v. Electric Weld Division*, 283 Pa.Superior Ct. 35, 423 A.2d 702

7. The Public Accounting firm would only certify annual statements, for which they had conducted an indepth audit.

(1980); and *Daburlos v. Commercial Insurance Co. of Newark, N. J.*, 521 F.2d 18 (3rd Cir. 1975).

Here the parties were aware of the SEC's ability to delay the effective date and provided for such delay in two different manners. The parties agreed to a guaranteed price provision to provide for *"whenever the SEC approved"* the registration statement. The parties also agreed that Keller should exert reasonable efforts to that end; Keller did not guarantee a specific time for SEC approval. Yet the appellees and the lower court would further require Keller to foresee and provide for the SEC's actions. We disagree. In light of various unquestioned facts, we believe Keller's conduct was reasonable under the circumstances and that the Yoffes assumed the risk that the SEC would proceed as it did.

Keller's filed registration statement was not questioned as it pertained to the instant case; instead, the SEC was concerned with previous interim statements. These interim statements, questioned by the SEC, had been compiled based on Keller's long standing accounting practices, and had been reviewed by a reputable accounting firm which deemed them to be reasonable. It is admitted that there were various acceptable accounting practices concerning deferrals used at that time. We find that Keller could not reasonably foresee that the SEC would undertake an informal investigation of its prior accounting practices especially when under new management, those practices had been modified.

Contrary to the finding in *Kupferman*, supra, here the SEC's discretion, though circumscribed by statutes and regulations was not reasonably predictable. Unlike *Republic Technology*, supra, in this case the statements at issue were not part of the registration filing. And more so, even the interim reports that were questioned had been reviewed and approved by a public accountant unlike the situation in *Republic Technology*. As in *Lipsky*, supra, the filing of a complaint by the SEC in this case, which resulted in a consent decree does not establish Keller's omission to use reasonable efforts. Had Keller warranted not to take any

actions which may threaten the registration process, then the current case might be similar to *United Telecomm.*, but Keller did not so warrant.

Order of the lower court is vacated with directions to enter judgment for appellant, at No. 499 Philadelphia 1980.

Appeal at No. 82 Philadelphia 1980 is Quashed.